No. 50,155

NATIONAL EDUCATION ASSOCIATION-TOPEKA, INC., a Corporation, *Appellee,* v. U.S.D. No. 501, SHAWNEE COUNTY, KANSAS, *Appellant.*

TOPEKA BOARD OF EDUCATION, UNIFIED SCHOOL DISTRICT No. 501, SHAWNEE COUNTY, KANSAS, *Appellant,* v. NEA-TOPEKA, INC., *et al., Appellees.*

(592 P.2d 93)

Opinion filed February 24, 1979.

*William G. Haynes,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause, and *Paul H. Hulsey,* of the same firm, was with him on the brief for the appellant.

*Wesley A. Weathers,* of Crane, Martin, Claussen, Hamilton & Barry, of Topeka, argued the cause, and *Patricia R. Griffin,* of the same firm, was with him on the brief for the appellee.

*James R. Goheen and Gloria Vusich,* of McAnany, Van Cleave & Phillips, P.A., of Kansas City, Kansas, were on the brief for U.S.D. No. 500, Kansas City, Kansas, *amicus curiae.*

The opinion of the court was delivered by

McFARLAND, J.: This appeal involves disputes between the National Education Association-Topeka, Inc. (hereinafter referred to as NEA-Topeka) and Unified School District No. 501 (hereinafter referred to as Board), arising from their professional negotiations for the 1978-79 school year. The Board brings this appeal from adverse determinations by the trial court.

The facts are long and involved and will be streamlined as

much as possible. NEA-Topeka is the professional employees' association duly authorized to collectively negotiate with the Board on behalf of the teachers of USD 501. On December 1, 1977, the Board and NEA-Topeka, pursuant to K.S.A. 1978 Supp. 72-5423, exchanged notices of items to be negotiated for the 1978-79 school year. Negotiations began on December 5, 1977, and twelve negotiating sessions were held prior to January 30, 1978, when NEA-Topeka filed two actions in the district court. One action asked the court to find that an impasse existed. This impasse action was voluntarily dismissed by NEA-Topeka. The second action (78-CV-0094) accused the Board of bad faith negotiations and commission of a prohibited practice, and sought a temporary injunction to require the Board to enter into good faith negotiations and, upon hearing on the merits, a permanent writ of mandamus as well as attorney fees. On the same date the Board filed an action (78-CV-0096) against NEA-Topeka, seeking determination that NEA-Topeka was not negotiating in good faith, that certain items were not mandatorily negotiable, and other relief. On March 3, 1978, while these two cases were pending, NEA-Topeka filed another petition asking the court to determine that an impasse existed. The impasse trial was held on March 7-10, 1978. The trial court found on March 13, 1978, that an impasse existed. This determination of impasse was appealed to this court by the Board. The appeal was dismissed on the basis that a declaration of impasse was not an appealable order. *In re NEA-Topeka, Inc.,* 224 Kan. 582, 581 P.2d 1187 (1978). The two remaining cases were consolidated for trial and were so tried. Exhibits and transcripts of the impasse trial were admitted in evidence at the trial. On May 30, 1978, the trial court entered its memorandum decision determining both cases. The court held generally in favor of NEA-Topeka and the Board brings this appeal. Additional facts, as necessary to determine particular issues, will be included in this opinion.

The first issue is whether the trial court erred in concluding that certain items contained in NEA-Topeka's notice to negotiate were mandatorily negotiable.

In 1970, the legislature enacted the Collective Negotiations Law (K.S.A. 72-5413 *et seq.*). In K.S.A. 72-5413(*g*) the following definition appears:

" 'Professional negotiation' means meeting, conferring, consulting and dis-

cussing in a good faith effort by both parties to reach agreement with respect to the terms and conditions of professional service."

In 1976 and 1977 the statute was amended, but the amendments did not alter the section above cited.

In *National Education Association v. Board of Education*, 212 Kan. 741, 512 P.2d 426 (1973) (commonly referred to as *Shawnee Mission*), this court was confronted with the question of what items were negotiable within the phrase "terms and conditions of professional service." The opinion in *Shawnee Mission* is highly significant to the case before us and will be quoted at length as follows:

"On this issue the trial court found 'that the school district is not compelled to maintain collective negotiations with the plaintiff association over matters of basic policy. Such matters are the exclusive legal responsibility of the school board in the exercise of its delegated authority.' It went on to say:

" 'The Court concludes that the words "terms and conditions of professional service" refer to the following areas:

" '*Salaries and wages; hours and amounts of work; vacation allowance; holiday, sick and other leave; number of holidays; retirement; insurance benefits; wearing apparel; pay for overtime; jury duty and grievance procedure* and such other areas that directly or by implication involve these factors. [Emphasis added.]

" 'The Court specifically concludes that this does not include educational policies of the school district.'

"NEA claims that the term is much broader than this, and encompasses any matter which may in any way affect the working conditions of a teacher. In particular, however, they point to two lists of items contained in their original proposal which are not covered by the court's definition of 'terms and conditions of professional service.' The first contains items which the Board team at a negotiating session stipulated were negotiable—although only in the Board's limited concept of negotiability. This list includes such things as *probationary period, transfers, teacher appraisal procedure, disciplinary procedure, and resignations and termination of contracts.* [Emphasis added.]

"The second list contains items hotly contested by the Board throughout, including such things as curriculum and materials, payroll mechanics, certification, class size and the use of para-professionals, the use and duties of substitute teachers, and teachers' ethics and academic freedom. The Board views most of these matters as peculiarly its own concern, while the last it regards as peculiarly the concern of the teachers. In neither event does it regard them as negotiable.

"The problem is not without difficulty. The legislature saw fit not to define the critical term or to list the items it regarded as negotiable. Compare, for example, K.S.A. 1972 Supp. 75-4322(s) of the Public Employer-Employee Relations Act, where for public employees other than teachers 'conditions of employment' is specifically defined in terms generally in line with those adopted by the trial court here.

"In an attempt to resolve the issue of legislative intent we look to the legislative history of the act. We find that in the 1969 session of the legislature two competing

bills were introduced, Senate Bill 218 and House Bill 1562. Both provided for collective negotiations by teachers. Neither bill passed in that session, but both were referred to committee for interim study.

"SB 218 defined professional negotiations as a good faith effort to reach agreement with respect to 'the terms and conditions of professional service *and other matters of mutual concern.*' This phraseology, we find, had its origins in the policy formulations of our NEA's parent organization, the National Education Association of Washington, D.C. . . .

. . . . .

"It may be seen that NEA's language was employed verbatim in 1969 SB 218. It was later inserted in the first draft of 1970 HB 1647, which became the 1970 act now under consideration. If given the intent ascribed to it by its authors the language would be broad indeed, and had it been adopted it would have narrowed the concept of 'non-negotiable management prerogative' to near zero. It was not adopted, however; in the 1970 legislative process the phrase 'and other matters of mutual concern' was stricken. We can only infer from this that 'matters of mutual concern' are *not* to be negotiable, but only 'terms and conditions of professional service.' This, to our mind, eliminates those matters on the NEA's second list such as curriculum and class size. While these may be matters of 'concern' to the teacher, we see the legislative action as a deliberate effort to remove such concepts from the area of negotiability.

"On the other hand, 1969 HB 1562 was also lost completely in the legislative mill. It contained an extremely limited definition of 'conditions of professional services,' *i.e.,* the term included 'only wages, hours, and other economic conditions of employment.' That phrase in turn was defined to mean 'salaries and wages; hours and the amounts of work; vacation allowances; holidays; retirement; insurance benefits; wearing apparel; pay for overtime; jury duty pay and grievance procedures.' The 1970 legislature rejected this restrictive approach to the matter of negotiability, just as it rejected the expansive approach of the NEA.

"The bill finally adopted was clearly a compromise between the demands of—to put it bluntly—labor and management. Neither got all it desired from the legislature. Yet we think the definition of 'terms and conditions' fashioned by the trial court results in the judicial creation of just such a limitation as the legislature was unwilling to adopt. We think the items on NEA's first list—those conceded by the Board team to be negotiable—fall fairly within the phrase 'terms and conditions of professional service' and are thus negotiable.

"It does little good, we think, to speak of negotiability in terms of 'policy' versus something which is not 'policy.' Salaries are a matter of policy, and so are vacation and sick leaves. Yet we cannot doubt the authority of the Board to negotiate and bind itself on these questions. The key, as we see it, is *how direct the impact of an issue is on the well-being of the individual teacher, as opposed to its effect on the operation of the school system as a whole.* The line may be hard to draw, but in the absence of more assistance from the legislature the courts must do the best they can. The similar phraseology of the N.L.R.A. has had a similar history of judicial definition. See *Fibreboard Corp. v. Labor Board,* 379 U.S. 203, 13 L.Ed.2d 233, 85 S.Ct. 398, and especially the concurring opinion of Stewart, J., at pp. 221-22." [Emphasis added.] 212 Kan. at 750-53.

The 1977 legislature amended K.S.A. 72-5413 to define "terms and conditions of professional service" as follows:

"(1) 'Terms and conditions of professional service' means salaries and wages, hours and amounts of work, vacation allowance, holiday, sick and other leave, number of holidays, retirement, insurance benefits, wearing apparel, pay for overtime, jury duty, grievance procedure, disciplinary procedure, resignations, termination of contracts, matters which have a greater direct impact on the well-being of the individual professional employee than on the operation of the school system in the school district or of the community junior college and such other matters as the parties mutually agree upon as properly related to professional service. Nothing in this act, or the act of which this section is amendatory, shall authorize the adjustment or change of such matters which have been fixed by statute or by the constitution of this state."

It is obvious that the above definition from "salaries and wages" through "grievance procedure" is taken in sequence and verbatim from the *Shawnee Mission* trial court's determination of the areas included in the phrase "terms and conditions of professional service." This court, in *Shawnee Mission*, found the list unduly restrictive and added the following items: probationary period, transfers, teacher appraisal procedures, disciplinary procedure, resignations, and termination of contracts. In the legislative definition of "terms and conditions of professional service," the three specific items following the trial court's list are disciplinary procedure, resignations, and termination of contracts. Again, we have a sequential and verbatim recitation of three of the six items added by this court to the list of negotiable items in *Shawnee Mission.* Finally, we have the phrase "matters which have a greater direct impact on the well-being of the individual professional employee than on the operation of the school system." This is simply a restatement of the "impact test" from *Shawnee Mission.*

The legislature in enacting K.S.A. 1978 Supp. 72-5413(*l*) made statutory law out of the judicial determination in *Shawnee Mission,* except "probationary period, transfers, and teacher appraisal procedures" were deleted therefrom as mandatorily negotiable items.

In *Garden City Educators' Ass'n v. Vance,* 224 Kan. 732, 735, 585 P.2d 1057 (1978), the following statement was contained in the majority opinion:

"In an effort to provide a more balanced situation for the bargaining process, the 1977 legislature enacted amendments to the Act, which expanded and clarified the scope of mandatory negotiations (K.S.A. 1977 Supp. 72-5413[*l*]). . . ."

To clarify this statement, we find the expansion of the scope of mandatory negotiation refers only to the inclusion of the term "and such other matters as the parties mutually agree upon as properly related to professional service." In other respects the statute is a restatement of the scope of mandatory negotiations as set forth in *Shawnee Mission,* less the three deleted items.

The determination of whether a particular item has greater impact on the well-being of the individual teacher than on the school district may be difficult in many instances, as we said in *Shawnee Mission,* but courts must do the best they can.

The particular items in question herein are as follows:

1. The payroll deduction of NEA-Topeka dues upon consent of the individual teacher, with NEA-Topeka to take responsibility for any errors.

2. Transaction of NEA-Topeka business in the schools during nonduty or planning time. Further, that grievance procedures could be prepared during duty time. Both activities are conditioned on noninterference with professional duties.

3. Officials and designated representatives of NEA-Topeka to have a total pool of 100 days of leave with pay for performance of association duties. Option of the president of NEA-Topeka to go on half-time status.

4. NEA-Topeka to have right to use the local interschool mail system without charge to extent permitted by law.

5. The Board to be required to provide and distribute copies of professional agreement to each teacher, plus 100 extra copies for NEA-Topeka.

6. Class size.

7. Conformity of individual contracts to negotiated agreement. Written contracts to be required for all services performed.

8. Disposition of new funds from the federal program for "mainstreaming" handicapped children into regular classroom.

9. Removal from classroom of disruptive "mainstreamed" handicapped children.

10. Conditions of Extended Employment. This does not involve supplemental contracts or summer school, but certain categories of individuals required to work beyond the regular school year.

The trial court found all of the above items were mandatorily negotiable except No. 7 as it related to supplemental contracts, and No. 8. Before proceeding further it should be emphasized that the question before us is whether or not particular items are mandatorily negotiable pursuant to K.S.A. 1978 Supp. 72-5413(*l*); the merit, practicality, or wisdom of the proposals is not involved. It should also be noted that hundreds of pages of briefs have been filed in this case and it is not feasible to list every contention or argument of the parties. Instead, we will only broadly summarize the parties' positions.

Items Nos. 1 through 5 fall in the general category of proposals of direct benefit to NEA-Topeka in transacting its affairs. The Board argues that under the impact test these items must fail as they are not for the benefit of the individual teacher but for the benefit of NEA-Topeka. The Board further argues that assisting NEA-Topeka is a prohibited practice under K.S.A. 1978 Supp. 72-5430(*b*)(2). NEA-Topeka argues that it is but an agent for the teachers, and that such items are essential to the teachers' statutory right to collectively negotiate. We agree with the trial court's conclusion that items Nos. 1 through 5 were mandatorily negotiable under the impact test and, further, that No. 3 was included in "other leave." On these items NEA-Topeka is the agent of USD 501 teachers; hence, it stands in the shoes of the teachers under the impact test. From the evidence, none of these items have any significant impact on the operation of the school district but they do have considerable impact on the individual teacher. The conclusion as to No. 5 is further supported by our determination in *Riley County Education Ass'n v. U.S.D. No. 378,* 225 Kan. 385, 592 P.2d 87 (1979), that teachers' "contracts of employment" referred to in the Continuing Contract Law (K.S.A. 1978 Supp. 72-5411 and 72-5437) include both individual contracts and negotiated agreements.

We turn now to item No. 6, class size. The trial court found class size was mandatorily negotiable on the basis that it involved "amounts of work" and that its exclusion in *Shawnee Mission* is no longer controlling. The Board contends this is too broad an interpretation of "amounts of work" and that it lies within managerial prerogative. NEA-Topeka argues class size is a basic element in determining work load and concurs with the trial court

that the contrary holding in *Shawnee Mission* is no longer controlling.

On the rationale previously expressed in this opinion, *Shawnee Mission*, 212 Kan. at 752, is controlling on this question. Class size is not mandatorily negotiable. Further, class size has a tremendous impact on the school district because it involves such factors as the number of classrooms and teachers needed. "Amounts of work" does not include class size. We hold the trial court erred in determining class size was a mandatorily negotiable item.

Item No. 7 provides that individual contracts be in conformity with the negotiated agreement and that written contracts be issued to all teachers performing professional services. The trial court correctly found supplemental contracts were not subject to collective negotiation by their express statutory exclusion in K.S.A. 72-5412a, which provides:

"The board of education of any school district may enter into a supplemental contract of employment with any employee of the district. As used in this section 'supplemental contract' means a contract for services other than those services covered in the principal or primary contract of employment of such employee, and shall include but not be limited to such services as coaching, supervising, directing and assisting extra curricular activities, chaperoning, ticket taking, lunch room supervision and other similar and related activities. None of the provisions of article 54 of chapter 72 of Kansas Statutes Annotated, including the sections thereof in the 1971 comulative pocket-part supplement, shall be applicable to any employee's supplemental contract.

The Board contends the trial court erred in finding that the item was mandatorily negotiable as it related to primary contracts. The Board further contends the only areas where written contracts are not issued are in supplemental contracts such as summer school and night school. The Board argues the contract conformity aspect would contravene K.S.A. 1978 Supp. 72-5415, which provides:

"(a) The representative designated or selected for the purposes of professional negotiation by the majority of the professional employees in an appropriate negotiating unit shall be the exclusive representative of all the professional employees in such unit for such purpose.

"(b) Nothing in this act or in the act of which this section is amendatory shall be construed to prevent professional employees, individually or in concert or through such representatives as they may choose collectively or individually, from presenting or making known their positions and/or proposals to a board of education, a superintendent of schools or other chief executive officer employed by a board of education."

The Board reasons that individual teachers and the Board could no longer confer as to the contents of their individual contracts. We construe the portion of the statute in question to permit individual teachers to make their individual positions on proposals under collective negotiation known to the Board during such negotiations. We hold the trial court correctly concluded that the provision for contract conformity, as limited to primary contracts, was mandatorily negotiable, as was the provision requiring the issuance of written contracts.

Item No. 8 is not involved in this appeal as no challenge is made to the trial court's determination.

Item No. 9 involves the removal from classrooms of "mainstreamed" handicapped children who are unduly disruptive or otherwise interfere with the education of the regular classroom students. The trial court found this item to be mandatorily negotiable as involving "disciplinary procedures" and "amounts of work," as well as under the impact test. The Board argues that "disciplinary procedures" refers to discipline of teachers rather than discipline of students by teachers. The Board further argues that the handicapped student programs are regulated and controlled by many federal and state laws and regulations and therefore cannot be negotiated, and that the item fails the impact test. NEA-Topeka argues that the trial court correctly determined the matter. Also, NEA-Topeka states it retreated from its original position of seeking a negotiated right to remove such students and sought only to have the Board adopt a procedure for such removal.

"Disciplinary procedures" refers to discipline of teachers by the school administration. Under the maxim *noscitur a sociis* (it is known from its associates), the term "disciplinary procedure" should be read as having the same general qualities and characteristics as its fellow terms. See *Smith v. Marshall,* 225 Kan. 70, Syl. ¶ 4, 587 P.2d 320 (1978). Discipline of students by teachers lacks any of the qualities and characteristics of the other terms in K.S.A. 1978 Supp. 72-5413(*l*). Any procedure for removal of "mainstreamed" students is for the Board to determine rather than being a part of a negotiated agreement. Discipline of students is not a part of "amounts of work" and fails the impact test. We conclude the trial court erred in determining that the right of

teachers to remove disruptive "mainstreamed" handicapped children was mandatorily negotiable.

Item 10, the final item, refers to Conditions of Extended Employment. In order to understand the item, it is necessary to state the proposal verbatim:

> *"Current language does not differentiate between 'summer school' and 'extended employment.' The purpose of this wording is to make that distinction clear.*
>
> "Any member of the bargaining unit who is employed by the district beyond the normal teacher contract year in positions specified below shall be placed on an 'extended contract.'
>
> "Positions covered by extended contracts shall be:

| | |
|---|---|
| Capper Foundation | Media Specialists |
| Capital City Schools | Adventure Center |
| High School Counselors | Special Ed Chairpersons |
| Psychologists | Deaf/Blind Program |
| Social Workers | Environmental Ed./Outdoor Education |
| Art Resource Advisors | And others as designated by the Board |

> "Members of the bargaining unit employed on extended contracts shall be paid their daily per diem rate of pay during their period of extended employment. Members so employed shall enjoy the same fringe benefits, and rights and privileges to which they are entitled under a regular teaching contract including, but not limited to, proportional accumulation of sick leave and use of sick leave . . . ."

The trial court found this item to be mandatorily negotiable only as it related to "principal or primary" contracts of employment, and excluded supplemental contracts. The Board contends all such services are the subject of supplemental contracts. The evidence reflects that the school at the Capper Foundation is virtually a year-round operation. Teachers there must work beyond the regular 187-day school year. There is a definite difference between this situation and the teaching of summer school which is clearly separate and distinct from regular teaching duties. In the Capper situation teachers perform their regular 187-day duties for an extended time. We find no error in the determination of the trial court that "Conditions of Extended Contracts," with supplemental contracts excluded, was a mandatorily negotiable item. We have insufficient evidence before us, however, to determine whether the duties of the various classifications (other than Capper's) are extended contracts or supplemental contracts, and we do not expressly find each classification is proper.

The next issue is whether the trial court properly determined an

order of mandamus should issue against the Board. The decision of the trial court in this regard is as follows:

"The court is of the opinion the Association is entitled to a judgment against the Board in mandamus requiring the Board to enter into professional negotiations in a good faith attempt to reach agreement on the subjects found by the Court to be mandatorily negotiable as set out in the foregoing finding and it is so ordered by the Court."

The action brought by NEA-Topeka against the Board (78-CV-0094) alleged the Board had negotiated in bad faith by refusing to negotiate the disputed items above referred to and thereby had committed a prohibited practice as defined by K.S.A. 1978 Supp. 72-5430(b)(1) and (5). In its prayer for relief NEA-Topeka stated:

"WHEREFORE, the Association prays for a temporary injunction to require good faith negotiations pending a full hearing of this case on the merits and thereafter a permanent writ of mandamus, its attorney fees and such other damages as may have been occasioned or will be occasioned in the future by the acts of the Board along with the costs of this action."

As to the nature of mandamus, in *Armstrong v. City of Salina*, 211 Kan. 333, 340, 507 P.2d 323 (1973), we said:

"The remedy of mandamus is available only to compel the performance of a clearly defined duty. Its purpose is to require one to whom the order is issued to perform some act which the law specifically enjoins as a duty resulting from his office, trust or position; the remedy may not be invoked to control discretion nor does it lie to enforce a right which is in substantial dispute. Resort to the remedy may be had only when the party invoking it is clearly entitled to the order which he seeks."

The duties whose performance was sought to be compelled were to negotiate in good faith and not to commit prohibited practices. The trial court made no finding that the Board had failed to negotiate in good faith or that it had committed a prohibited practice. Absent a finding that the Board was violating an alleged duty, there was no basis to support the order of mandamus. The trial court, in effect, rendered a declaratory judgment as to what items were or were not mandatorily negotiable under K.S.A. 1978 Supp. 72-5413(l). If the trial court had found the Board (or NEA-Topeka in 78-CV-0096) had committed a prohibited practice as defined by K.S.A. 1978 Supp. 72-5430, then injunctive relief could have been granted in accordance with the statute. We must conclude there was no legal basis for the issuance of an order of mandamus and the same is reversed. The determinations constituting the declaratory judgment are unaffected thereby.

This concludes the opinion as far as the issues before us on the case of NEA-Topeka v. Board (78-CV-0094). We turn now to the issues raised in Board v. NEA-Topeka (78-CV-0096). This was an action brought by the Board against NEA-Topeka seeking a declaration that the Association had refused to negotiate in good faith; that the Association be ordered to cease and desist from attempting to negotiate non-negotiable items (the items contained in the declaratory judgment procedure heretofore discussed); and that the Association be ordered to return to the bargaining table and negotiate in good faith. The trial court made numerous findings of fact and conclusions of law and held:

"Based upon the foregoing findings of fact and conclusions, the Court is of the opinion the Association has not refused to negotiate in good faith in any respect as contended by the Board and that the Board is not entitled to the relief demanded in its petition in case No. 78-CV-0096."

The Board contends this determination was erroneous and contrary to the evidence. The first matter to be determined is the proper scope of review.

This court considered the scope of review in cases involving a negative finding in *Short v. Sunflower Plastic Pipe, Inc.*, 210 Kan. 68, Syl. ¶¶ 3-5, 500 P.2d 39 (1972), and held:

"A negative finding is descriptive of a trial court's failure to find the existence of a fact, or of a trial court's finding of the nonexistence of a fact or set of facts.

"The effect of a negative finding is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary and capricious disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice on the part of the trial judge, the finding cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed.

"While affirmative findings of a trial judge are not to be set aside unless clearly erroneous under K.S.A. 60-252(*a*), the setting aside of a negative finding usually requires the nullification of a trial court's disbelief of evidence, or rejection of evidence."

As to the positive findings of fact contained in the decision, the general rule is that where the trial court's findings are supported by substantial competent evidence, they are conclusive on appeal. *McGilbray v. Scholfield Winnebago, Inc.*, 221 Kan. 605, Syl. ¶ 3, 561 P.2d 832 (1977).

The only finding of fact which causes us concern is No. 16 which states:

"There is no evidence to support the Board's contention the Association used the strategy included within the training manuals or any of the material in the manuals referred to in the Board's contention No. 11, these being manuals brought to this Court by Mr. Rodney Van Zandt as required by a subpoena duces tecum but quashed by the Court."

Mr. Van Zandt was the assistant executive director for the Kansas National Education Association (KNEA), who, under the Board's subpoena duces tecum, brought certain materials to the court. These materials included correspondence, training manuals, and other documents prepared by KNEA to assist teachers' negotiating teams. The court, on motion of NEA-Topeka, limited the materials to documents, materials, and correspondence between KNEA and NEA-Topeka. The Board wanted the materials because it believed they would support its claim of bad faith in negotiations on the part of NEA-Topeka. More specifically, it contended that NEA-Topeka had deliberately negotiated in bad faith to force the impasse procedure and that this procedure was a part of the strategy contained in the requested material. It was the position of NEA-Topeka that these materials were "sensitive," in the category of "trade secrets," and their disclosure would hamper teachers' negotiating teams across the state. Mr. Van Zandt, in his testimony, speculated that the materials had been used by NEA-Topeka as part of their negotiating strategy.

The trial court viewed the materials *in camera* and quashed the subpoena duces tecum on the grounds the materials were not relevant and there was a right of privacy. The parties have supplied this court with considerable authority in support of their respective positions. We find the Board's argument persuasive. We cannot determine this point because the materials in question are not before us. Having had no opportunity to view the materials, we cannot determine that the trial court erred in quashing the subpoena duces tecum.

We have reviewed the record and find no reversible error in the trial court's determination that NEA-Topeka had not refused to negotiate in good faith.

All points raised have been carefully considered, whether or not specifically enumerated herein.

The judgment is affirmed in part and reversed in part.