No. 55,721

NATIONAL EDUCATION ASSOCIATION - WICHITA, *Appellee,* v. UNIFIED SCHOOL DISTRICT NO. 259, SEDGWICK COUNTY, KANSAS, *Appellant.*

(674 P.2d 478)

Opinion filed December 2, 1983.

*William H. Dye,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued

the cause, and *Wyatt M. Wright,* of the same firm, was with him on the briefs for the appellant.

*David M. Schauner,* of Topeka, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

LOCKETT, J.: This is an appeal by the defendant, Unified School District No. 259, from an order of the District Court of Sedgwick County, Kansas, in favor of the plaintiff, National Education Association - Wichita. The district court enjoined defendant from unilaterally implementing a schedule change by eliminating a "coordination" work period and replacing that period with an additional period of classroom instruction.

The National Education Association - Wichita (NEA-Wichita) is the exclusive bargaining representative for all teachers in U.S.D. No. 259. Unified School District No. 259, Wichita, Kansas (the Board) is the owner of the Roosevelt Junior High School facility. Between February and October of 1981, NEA-Wichita and the Board participated in negotiations concerning the terms and conditions of professional service. During the negotiation process and the school year preceding negotiations, six of the Board's fifteen junior high schools operated on a six-period day, while the other nine operated on a seven-period day. The length of the school day was from 8:00 a.m. until 3:00 p.m. at all fifteen of the junior high schools. The negotiated contract had an effective date of August 1, 1981, and extended through July 31, 1983.

The schedule at Roosevelt Junior High School consisted of six periods for the 1978-79 school year. The teachers at Roosevelt each taught five classes and each teacher had a planning period in which to prepare for classes. The class schedule for Roosevelt was unilaterally changed for the 1979-80 school year by the school's administration. Without altering the school hours, the number of periods was increased from six to seven with the length of each period being shortened.

A new team teaching concept was instituted by the school's administration for the 1979-80 school year at Roosevelt and implemented by the creation of the seventh period. The concept was designed to improve communication between students and teachers, and between parents of the students and teachers. Under the new program, teachers were formed into multi-teacher teams for each grade. A team leader was appointed for

each team and was required to plan activities for the team. The only member of the team that received extra pay for the seventh hour was the team leader. The seventh period of the day was used by the team to meet and discuss progress of students taught by the team, or a teacher could meet with a student, or teachers could meet in a group to discuss a student or students, or a teacher could meet with a parent of a student. Teachers taught for five periods, had one planning period, and met with the team or carried out team activities for one period. During these periods reserved for the team, students would be assigned to elective courses, such as music or art. The unilateral implementation of the team teaching process by the school's administration was enthusiastically accepted by the teachers of Roosevelt.

The seven-period team teaching concept was in effect at Roosevelt when the August 1, 1981, agreement took effect. In February, 1982, the Board issued to Roosevelt Junior High's principal a bulletin requiring the seventh period no longer be used for team teaching; instead the extra hour would be used by the teachers to teach the regular subjects. The Board directed this change to facilitate the scheduling of remedial reading classes pursuant to a curriculum recommendation made by a community task force previously appointed by the Board. The principal of Roosevelt, James E. Haught, abandoned the team teaching approach. The team period was converted to a teaching period, to enable remedial reading to be added to the schedule. The principal impact of this change upon the teachers at Roosevelt was that it required them to prepare and to teach one additional class each day, although each teacher would teach only a few additional minutes a day. NEA-Wichita claims that the Board was attempting to unilaterally change, without negotiation, the teachers' "hours and amount of work," a mandatorily negotiable topic set forth in K.S.A. 72-5413(1), and seeks to enjoin the Board from changing the seventh period to an additional teaching period.

On March 30, 1983, the district court granted NEA-Wichita's motion to permanently enjoin the Board from unilaterally changing a term and condition of the teachers' employment without first negotiating the topic with NEA-Wichita. The district court, relying on *Chee-Craw Teachers Ass'n v. U.S.D. No. 247*, 225 Kan. 561, 593 P.2d 406 (1979), and *Dodge City Nat'l*

*Education Ass'n v. U.S.D. No. 443,* 6 Kan. App. 2d 810, 635 P.2d 1263, *rev. denied* 230 Kan. 817 (1981), found that the number of class periods per day is a topic that is, by statute, mandatorily negotiable. Additionally, the district court found that the number of class periods to be taught in the normal school day by a classroom teacher in U.S.D. No. 259 during the years 1981, 1982 and 1983 was not a subject of negotiation leading to the agreement now in force covering those years. The Board appealed from the March 30, 1983, decision of the district court. This case was transferred from the Court of Appeals to the Supreme Court.

The standard of review by an appellate court is well established. Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *City of Council Grove v. Ossmann,* 219 Kan. 120, 546 P.2d 1399 (1976); *Sunflower Electric Coop., Inc. v. Tomlinson Oil Co.,* 7 Kan. App. 2d 131, 638 P.2d 963 (1981), *rev. denied* 231 Kan. 802 (1982).

The Board contends that the trial court erred in finding that it failed to negotiate with NEA-Wichita any increase in the number of class periods to be taught by a teacher. The contention that negotiations on this topic did occur is based largely on the fact that the 1981-83 contract and Art. V, Sec. D, Para. 7 deleted all reference to the word "hours" and substituted "periods" pursuant to a proposal made by the Board. This language change occurred in a paragraph that dealt solely with the activities and hours of a departmental coordinator, a teacher appointed to coordinate the activities of a subject matter area having three or more teachers.

The 1980-81 contract in pertinent part stated in Art. V, Sec. D, Para. 7:

"(a) Junior High and Senior High Department Coordinators with 9-17 teachers in the department shall be assigned one (1) coordination work hour per day.

"(b) Junior High and Senior High Department Coordinators with 18 or more teachers in the department shall be assigned two (2) coordination work hours per day.

"(c) In each case cited in this paragraph, the coordination work hour(s) is in lieu of a teaching work hour(s); and the number of teaching hours plus the number of coordination work hours shall equal no more than five (5) hours per day.

"(d) The coordination work hour(s) is for the purpose of coordinating the activities of the department.

"(e) With approval of the building principal, a department coordinator may be provided with a substitute teacher to release the department coordinator from teaching responsibility in order that the department coordinator may fulfill responsibilities not possible to accomplish during coordination work hours."

The 1981-83 contract contained this identical language regarding coordination work periods, except the word "periods" was substituted for the word "hours," and (c) was changed to state:

"In each case cited in this paragraph, the coordination work period(s) is in lieu of a teaching work period(s)."

The trial court found that the change in wording was intended by the parties to more accurately reflect the actual time spent by departmental coordinators in schools already on a seven-period day where the coordination work period was less than 60 minutes. The paragraph heading itself evidences the fact that the change in the wording applied only to teachers who were departmental coordinators and not to all teachers. The trial court found that the change was not intended by the parties to affect anyone other than the departmental coordinators. Findings by the trial court indicate that the change in wording was solely an attempt at semantic clarification concerning departmental coordinators and not the result of full negotiations concerning the number of class periods to be taught by all classified personnel.

There is sufficient evidence to support the trial court's finding that the topic of the number of class periods to be taught per day was not negotiated.

The Board urges a contractual distinction between *Dodge City Nat'l Education Ass'n v. U.S.D. No. 443*, 6 Kan. App. 2d 810, and this case. The Board contends that the contract at issue in *Dodge City* contained neither a "management rights clause" nor a "closure clause," unlike NEA-Wichita and the Board's 1981-83 contract which included both such clauses. The management rights clause language appeared in the 1980-81 contract between NEA-Wichita and the Board but was not titled as such until the 1981-83 contract. This clause, as included in the 1981-83 contract, states:

"SECTION B: MANAGEMENT RIGHTS

"Paragraph 1: The Association acknowledges that the Board and the Superintendent have certain exclusive statutory rights and responsibilities which they may not surrender and that except as expressly provided otherwise by this agreement or by law, the final adoption of school policy, the administration and

operation of the schools, and the direction of the employees are vested exclusively in the Board and the administrative staff. Nothing herein shall be construed to limit the statutory power and duty of the Board to make, amend, or execute decisions and policies that are necessary to operate and maintain the teaching program and schools and to otherwise carry out its lawful rights and responsibilities. Neither shall anything in this agreement be construed to limit the statutory power and duty of the Superintendent."

The language of the closure clause had not appeared in previous contracts between the parties. This new clause, as included in the 1981-83 contract, states:

**"SECTION E: CLOSURE CLAUSE**
"**Paragraph 1:** Both the Board and the Association acknowledge that all mandatory subjects of negotiations have been negotiated and neither party has any right to negotiate further on these or any other subjects during the term of this agreement except by mutual consent.
"**Paragraph 2:** This agreement may be amended at any time by mutual consent. However, no amendment to this agreement shall be binding unless executed in writing and ratified by both the Board and the Association."

The Board contends that its inclusion in the 1981-83 contract of the management rights and closure clause justifies its unilateral change in the number of class periods per day and distinguishes this case from *Chee-Craw Teachers Ass'n v. U.S.D. No. 247,* 225 Kan. 561, and *Dodge City,* 6 Kan. App. 2d 810.

School districts in Kansas have only the power and authority that has been delegated to them:

"A school district is an arm of the state existing only as a creature of the legislature to operate as a political subdivision of the state. A school district has only such power and authority as is granted by the legislature and its power to contract, including contracts for employment, is only such as is conferred either expressly or by necessary implication." *Gragg v. U.S.D. No. 287,* 6 Kan. App. 2d 152, Syl. ¶ 3, 627 P.2d 335 (1981).

The inclusion of the management rights clause in the 1981-83 contract cannot enlarge the authority or power granted to the Board by the legislature. The language of the clause expressly recognizes that the Board and superintendent possess "statutory rights and responsibilities," and "statutory power and duty," which shall not be surrendered or limited except as expressly provided otherwise by this agreement or by law. The essential function of this clause is to preserve in the Board the authority which has been granted to it by statute.

The general grant of statutory power to its school board is found in K.S.A. 1982 Supp. 72-8205(*c*), which states:

"The board shall have authority to prescribe courses of study for each year of the school program and provide rules and regulations for teaching in the school district and general government thereof, and to approve and adopt suitable textbooks and study material for use therein subject to the plans, methods, rules and regulations formulated and recommended by the state board of education."

The general authority is limited by K.S.A. 72-5413(l), which provides that certain topics shall be mandatorily negotiable. Among these topics is "hours and amounts of work," an item interpreted to include the number of class periods per day. In light of this statutory limitation of the Board's general power, the existence in the 1981-83 contract of the management rights clause does not sufficiently distinguish this case from *Dodge City*.

The Board also contends that there is a contractual distinction in its claim that the closure clause functions as a type of waiver which precludes NEA-Wichita from complaining and/or litigating each time a principal makes a decision impacting upon a "term and condition of professional service." Additionally, the Board contends that the closure clause allows it to act unilaterally on any item not included in the agreement. In certain cases, narrowly drafted closure clauses exercised in good faith have been found to constitute a waiver of a union's right to require an employer to respond to a bargaining demand. See, *e.g.*, *GTE Automatic Electric Incorporated*, 261 N.L.R.B. 1491, 110 L.R.R.M. (BNA) 1193 (1982). By permitting the employer to invoke the closure clause as a shield against the union in the mid-term demand for bargaining about a new subject matter not specifically covered by the terms of the agreement, the court promotes contract stability and fosters industrial peace. However, the Board has not cited to this court cases which support its contention that a closure clause, coupled with a management rights clause, grants the Board a right to unilaterally change conditions of employment not included in the agreement.

A closure clause is nothing but a diluted form of waiver. The general rule is that a waiver of a union's right to bargain must be clear and unmistakable. *N.L.R.B. v. R. L. Sweet Lumber Company*, 515 F.2d 785, 795 (10th Cir. 1975). The trial court found that NEA-Wichita had not waived any of its rights to bargain.

The management rights clause and the closure clause, when viewed separately or read together, fail to justify the Board's unilateral change in the number of class periods per day in

Roosevelt Junior High. The existence in the 1981-83 contract of these two clauses does not provide a sufficient basis for distinguishing the case from *Chee-Craw* and *Dodge City*.

The Board contends that the trial court erred in its reliance upon *Chee-Craw* and *Dodge City*, which established that the number of class periods per day is a mandatorily negotiable topic.

*Chee-Craw* involved a dispute between a teachers association and U.S.D. No. 247 arising from their professional negotiations. In that case, this court defined the scope of mandatorily negotiable topics, and listed nineteen different topics which it declared to be mandatorily or nonmandatorily negotiable. One of the included topics was:

"12. WORKDAY (length of day, arrival and departure time, number of teaching periods, duty-free lunch period, and no custodial work)—Negotiable." 225 Kan. at 570.

*Chee-Craw* established that the number of teaching periods per day is mandatorily negotiable under K.S.A. 72-5413(l), since it is included in the statutory term hours and amount of work.

The Court of Appeals in *Dodge City*, 6 Kan. App. 2d 810, Syl., held:

"After a negotiated agreement has been reached between the exclusive representative of professional employees and a board of education pursuant to K.S.A. 72-5413 *et seq.*, then during the time that agreement is in force, the board, acting unilaterally, may not make changes in items which are 'mandatorily negotiable,' but which were not noticed for negotiation by either party and which were neither discussed during negotiations nor included within the resulting agreement."

In *Dodge City*, Justice Miller, sitting with the Court of Appeals, agreed with the trial court's finding and stated:

"[S]ince the number of teaching periods is a mandatorily negotiable item, the Board has no authority to unilaterally change the number of teaching periods without first submitting the proposed change to negotiations pursuant to K.S.A. 72-5423." 6 Kan. App. 2d at 811.

The Professional Negotiations Act, K.S.A. 72-5413 *et seq.*, was adopted in 1970. Among the topics included in the category "[t]erms and conditions of professional service" is "hours and amounts of work . . . regardless of its impact on the employee or on the operation of the educational system." K.S.A. 72-5413(l). The appellate courts of Kansas have held that if a

topic is by statute made a part of terms and conditions of professional service, then a topic is by statute made mandatorily negotiable. *Tri-County Educators' Ass'n v. Tri-County Special Ed.*, 225 Kan. 781, 594 P.2d 207 (1979); *NEA-Topeka, Inc. v. U.S.D. No. 501*, 225 Kan. 445, 592 P.2d 93 (1979). The term "hours and amount of work" has been interpreted to include the following:

1. The number of in-service days required in excess of 180. *NEA-Parsons v. U.S.D. No. 503*, 225 Kan. 581, 593 P.2d 414 (1979);

2. One half-day at the end of each grade period for grade card preparation and planning. *NEA-Kansas City v. U.S.D. No. 500*, 227 Kan. 541, 608 P.2d 415 (1980);

3. Seven and one-half hour teacher workday with a 30-minute daily preparation time without assigned duties. *NEA-Kansas City;*

4. The number of required, without pay, after-hours faculty meetings. *NEA-Kansas City;*

5. Workday (length of day, arrival and departure time, number of teaching periods, duty-free lunch period, and no custodial work). *Chee-Craw;* and

6. The number of teaching periods per day. *Dodge City.*

These items were held to be mandatorily negotiable. Conversely, the term "hours and amount of work" has been held not to include class size, which is therefore not a mandatorily negotiable item. *NEA-Topeka, Inc. v. U.S.D. No. 501*, 225 Kan. at 452. Since the number of class periods per day is a mandatorily negotiable topic as *Chee-Craw* and *Dodge City* indicate, the Board may not act unilaterally on that topic, but must enter into professional negotiation with the plaintiff before taking action.

The Board claims that the *Chee-Craw* decision is inapplicable to this fact situation because the teachers in U.S.D. No. 259 performed their activities on the basis of "duties" and not upon the basis of "hours." The Board urges a distinction between "one who performs only duties and one who performs duties only during certain hours." *Chee-Craw* was silent as to what the past practice in the school district had been concerning whether teachers performed their services on the basis of hours or duties. *Chee-Craw* determined the question of negotiability by using a definitional approach that looks beyond the particular phraseol-

ogy of a proposal to the topic to which the label has been applied. The Board's contention that the teachers in U.S.D. No. 259 performed their activities on the basis of duties instead of hours fails to demonstrate the inapplicability of the *Chee-Craw* holding to this case.

The Board believes that a school board's statutory duty to negotiate changes arises only when the Board desires to change its established practice in a mandatorily negotiable area. The holding in *Dodge City* precludes the Board from unilaterally making changes in any item which is mandatorily negotiable, without reference to whether or not an "established practice" exists in a mandatorily negotiable area.

The trial court is affirmed.