EAST RICHLAND EDUCATION ASSOCIATION, IEA-NEA, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD et al., Respondents.

Fourth District   No. 4—87—0408

Opinion filed July 28, 1988.—Modified on denial of rehearing September 28, 1988.

Gregory J. Malovance, of Winston & Strawn, of Chicago, and Sandra Holman, of Illinois Education Association, of Springfield, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield, and Randi Hammer Abramsky, of Illinois Educational Labor Relations Board, of Chicago (Shawn W. Denney, Solicitor General, and Imelda R. Terrazino, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Robbins, Schwartz, Nicholas, Lifton & Taylor, of Decatur (John T. Taylor and Philip H. Gerner III, of counsel), for respondent East Richland Unit School District No. 1.

JUSTICE SPITZ delivered the opinion of the court:

This is a direct appeal, pursuant to Supreme Court Rule 335 (107 Ill. 2d R. 335) and section 16(a) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 1716(a)), from an order of the Illinois Educational Labor Relations Board (Board) of May 14, 1987, finding the Board of Education, East Richland Unit School District No. 1 (employer), did not commit the unfair labor practices alleged in the complaint and, consequently, dismissing the complaint. (*East Richland Unit School District No. 1, Board of Education*, 3 Pub. Employee Rep. (Ill.) par. 1055, case No. 86—CA—0005—S (Illinois Educational Labor Relations Board, May 14, 1987).) We affirm.

On February 4, 1986, East Richland Education Association (Association), IEA/NEA, filed a charge with the Board alleging the respondent school district had engaged in unfair labor practices in violation of sections 14(a)(1) and (a)(5) of the Act (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(1), (a)(5)) by changing a scheduled vacation day—December 23, 1985—to a pupil attendance day, as the employer made the

change unilaterally and refused to bargain with the Association about it. The change was made to compensate for the lost pupil attendance day which resulted from a statutory amendment which changed Casimir Pulaski's birthday from a commemorative holiday to a scheduled legal holiday.

The Board issued a complaint, which was set for hearing. Upon the motion of the parties, the case was removed to the Board, which, upon the stipulated facts and exhibits and the briefs of the parties, issued its decision dismissing the complaint. This appeal followed.

## I

The controversy underlying this appeal revolves around the employer's midterm bargaining obligation, the effect given by the Board to the "zipper clause" in the parties' collective-bargaining agreement, and the legal standard to be applied in evaluating a defense of waiver based on such a zipper clause in an unfair labor practice case under the Act.

## A

According to the stipulated facts, prior to the end of the 1984-85 school year the employer issued a calendar which provided that December 23, 1985, was a vacation day; March 3, 1986, was a pupil attendance day; and school closed on May 30, 1986. In August 1985 the legislature enacted Public Act 84—175, effective January 1, 1986, amending section 24—2 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 24—2), redesignating Casimir Pulaski's birthday from a commemorative holiday to a legal holiday to be celebrated on the first Monday in March (1985 Ill. Laws 1783, 1786-87).

At various meetings of the employer's board, proposals for amendments to the school calendar to provide for Casimir Pulaski day were discussed. Although the Association's president requested the employer's board and superintendent to bargain on the issue of adjusting the school calendar to accommodate Casimir Pulaski day, the employer took the position that such a change in the school calendar was not a mandatory subject of collective bargaining and no bargaining took place. The employer's board asked that the teachers be polled and the superintendent issued a memo to school district personnel requesting information on two proposed vacation dates being changed to work days to accommodate the Casimir Pulaski holiday. In November 1985, the employer's board voted to amend the school calendar to make Monday, December 23, 1985, a day of school attendance unless 100% of the teaching staff signed to approve extending

the school year by one day in June 1986 and waived all rights to extra pay if the school year was extended one day. Thereafter, the employer decided to make December 23, 1985, the makeup day for the pupil attendance day lost by the addition of Casimir Pulaski's birthday as a legal holiday.

As a result, the employer's teacher employees worked December 23, 1985, as a pupil attendance day. Approximately 11 teachers were required to use personal leave to be absent from work that day and one teacher lost a day's pay.

■ Section 10(a) of the Act defines the duty to bargain, providing:

"An educational employer and the exclusive representative have the authority and the duty to bargain collectively as set forth in this Section. Collective bargaining is the performance of the mutual obligations of the educational employer and the representative of the educational employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, and to execute a written contract incorporating any agreement reached by such obligation, provided such obligation does not compel either party to agree to a proposal or require the making of a concession." (Ill. Rev. Stat. 1985, ch. 48, par. 1710(a).)

Section 14 of the Act provides in pertinent part:

"Educational employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employees in the exercise of the rights guaranteed under this Act.

\* \* \*

(5) Refusing to bargain collectively in good faith with an employee representative which is the exclusive representative of employees in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative \* \* \*." (Ill. Rev. Stat. 1985, ch. 48, pars. 1714(a)(1), (a)(5).)

Section 4 of the Act provides a management rights provision which states in pertinent part:

"Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure and selection of new employees and direction of employees. Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and

terms and conditions of employment as well as the impact thereon upon request by employee representatives." Ill. Rev. Stat. 1985, ch. 48, par. 1704.

In proceedings before the Board the employer argued (1) it had no duty to bargain on the calendar revisions; and (2) complainant had waived any duty which might otherwise exist under the Act to engage in midterm bargaining since, under the terms of the collective-bargaining agreement, the parties had waived any obligation to enter into midterm bargaining to amend the agreement.

■ With respect to the employer's first point, section 10—19 of the School Code provides:

"Each school board shall annually prepare a calendar for the school term, specifying the opening and closing dates and providing a minimum term of at least 185 days to insure 176 days of actual pupil attendance, computable under Section 18—8 ***. *** Except as provided in Section 10—19.1, the board may not extend the school term beyond such closing date unless that extension of term is necessary to provide the minimum number of computable days. In case of such necessary extension school employees shall be paid for such additional time on the basis of their regular contracts. ***

*A school board may make such changes in its calendar for the school term as may be required by any changes in the legal school holidays prescribed in Section 24—2."* (Emphasis added.) Ill. Rev. Stat. 1985, ch. 122, par. 10—19.

Turning to the parties' collective-bargaining agreement, the only pertinent provisions are set forth below. Article V of the parties' collective-bargaining agreement provided:

"5.1 School Year
The school year shall consist of not more than one hundred eighty-five (185) days, of which one hundred eighty (180) will be scheduled as pupil attendance and institute days. Five (5) of the one hundred eighty-five (185) days shall be declared by the Board as emergency days, provided no emergencies make it necessary to use them as school days."

Article X, entitled "Effect of Agreement," contained the following clauses—including the "zipper clause," section 10.6:

"10.1 Complete Understanding
The terms and conditions set forth in this Agreement represent the full and complete understanding and commitment between the parties hereto. The terms and conditions of this Agreement may be modified by alteration, change, addition to, or deletion

only through the voluntary, mutual consent of both parties in a written amendment executed in accordance with the provisions of this Agreement.

\* \* \*

10.4 Management Rights

It is expressly understood and agreed that all functions, rights, powers, or authority of the administration of the School District and the Board of Education which are not specifically limited by the express language of this Agreement are retained by the Board, provided however, that no such right shall be exercised so as to violate any of the specific provisions of this Agreement.

\* \* \*

10.6 Waiver of Additional Bargaining

The parties hereby acknowledge that the terms and conditions included in this Agreement represent the full and complete understanding between the parties. The Board and the Association, for the life of this Agreement, each waives any obligation to bargain collectively with respect to any subject or matter that may or may not have been known to either or both of the parties at the time this Agreement was negotiated or signed and that any bargaining will be limited to a successor Agreement, except that with the written mutual consent of both parties, such matters may be discussed and the Agreement modified.

\*\*\*

10.8 Term of Agreement

This Agreement shall become effective on August 1, 1985 and shall continue in effect until August 1, 1986."

The parties stipulated below that (1) during negotiations for the August 1985 to August 1986 bargaining agreement there was no discussion or mention, by either party, of holidays and/or starting or ending dates for the 1985-86 school year; and (2) prior to the 1985-86 school year, *under past practice the Board of Education had revised the school calendar during the school year without negotiating the revisions.*

While this case was pending, the Board issued its decision in *Rock Falls Elementary School District No. 13*, 2 Pub. Employee Rep. (Ill.) par. 1150, case No. 85—CA—0052—C (Illinois Educational Labor Relations Board, Nov. 12, 1986), *reh'g denied* (Jan. 15, 1987), 3 Pub. Employee Rep. (Ill.) par. 1014, wherein the Board found the bargaining representative waived its right to demand midterm bargaining when

it agreed to the "zipper clause" in the parties' collective-bargaining agreement, given there was no provision in the collective-bargaining agreement which specifically addressed the issue in question.

The Board gave the parties leave to file supplemental briefs based on *Rock Falls*. Thereafter, the Board denied the Association's motion to withdraw the case to a hearing officer, finding its offer of proof inadequate to raise questions of fact on whether the Association "voluntarily" agreed to the zipper clause, or on the bargaining history of the clause and the intent of the parties in adopting it, reasoning as follows:

> "The Association \*\*\* contends that the facts at a hearing would show that 'during the negotiations \*\*\* there were no discussions, nor any intent by the parties, nor did the Association ever agree that the waiver language was intended to permit the Respondent to make changes, unilaterally, in wages, hours and terms and conditions of employment during the life of the collective bargaining agreement.' We find this *absence* of discussion insufficient to raise an issue of fact over the meaning of the parties' zipper clause. [Emphasis in original.]
>
> In [*Rock Falls*], the zipper clause, like the one herein, expressly and unequivocally provided that '[t]he parties each voluntarily and unqualifiedly waive any rights which might otherwise exist under law to negotiate over any matter during the term of this [collective-bargaining] agreement \*\*\* even though each subject or matter may not have been within the knowledge or contemplation of either or both parties at the time they negotiated or signed the agreement.' *We held that such a clause, by its express terms, meant that the union waived its right to demand bargaining over changes that the employer sought to make, unless the change involved a term or condition set forth in the parties' collective bargaining agreement* [emphasis added], including practices guaranteed through a maintenance of standards clause. Thus, contrary to the Association's argument, through the contractual zipper clause in this case, like that in *Rock Falls*, the Association expressly waived its right to demand bargaining over changes in wages, hours and terms and conditions of employment that [the employer] sought to make during the life of the collective bargaining agreement, provided it did not conflict with other collective bargaining agreement provisions. Since there is no such [conflicting] provision in the parties' agreement, [the employer] was free to act.

Nevertheless, where there are discussions in collective bar-

gaining about a zipper clause and there is proof that the language does not mean what it says, such proof will certainly raise an issue of fact which warrants a hearing. It is the *absence* of any such discussions or expressions here that leaves the Association short of creating an issue of fact which warrants a hearing. [Emphasis in original.]" (*East Richland Unit School District No. 1, Board of Education,* 3 Pub. Employee Rep. (Ill.) par. 1031, at VII—83, case No. 86—CA—0005—S (Illinois Educational Labor Relations Board, March 10, 1987).)

The Board further stated: "In this regard, we note that while it may be presumed that parties use words in their ordinary sense, this 'presumption' does not govern where the parties' mutual intent to the contrary is demonstrated." 3 Pub. Employee Rep. (Ill.) par. 1031, at VII—83 n.3.

### B

In its May 1987 decision, the Board held that by the terms of the collective-bargaining agreement the Association had waived any right it may have had to engage in midterm bargaining over the employer's decision and its impact.

In reaching its decision, the Board stated the following approach to cases involving the parties' midterm bargaining obligations:

"In our decision in *Rock Falls* \*\*\*, we recognized that a bargaining obligation still exists under the Act once an agreement has been executed. We held that parties have a duty to engage in mid-term bargaining over mandatory bargaining subjects which were neither fully discussed nor embodied in the terms and conditions of their agreement.

However, in *Rock Falls* \*\*\*, we also acknowledged that an exclusive representative may contractually waive its right to engage in mid-term bargaining. An agreement to waive the right to bargain mid-term must be clear and unmistakable." (*East Richland Unit School District No. 1, Board of Education,* 3 Pub. Employee Rep. (Ill.) par. 1055, at VII—154.)

The Board stated a defense of contractual waiver may be analyzed as follows:

"In order to resolve this question, the party advancing the waiver defense may rely on express contractual language to satisfy its burden of establishing that the parties waived their respective rights and obligations to engage in decision and/or impact bargaining. However, because contractual language may sometimes be used in a manner alien to its normal usage, a

party to an agreement may also introduce extrinsic evidence to show that the parties did not use the contractual words in their ordinary sense." *East Richland Unit School District No. 1, Board of Education,* 3 Pub. Employee Rep. (Ill.) par. 1055, at VII—155.

Applying these principles to the labor contract provisions and evidence before it, the Board found the Association had waived—for the duration of the agreement—any right it may have had to bargain over revisions to the school calendar by agreeing to the inclusion of the broad zipper-clause language in section 10.6 of the collective-bargaining agreement. Looking to the language of section 10.6, the Board stated:

> "The ordinary meaning of this language expresses a waiver by the parties of bargaining over any known, as well as unknown, matter which might arise. It limits bargaining over such matters to a successor agreement, absent the parties' written mutual consent to the contrary. Thus, any right the Association might have had to engage in mid-term bargaining over revision of the school calendar clearly falls within the scope of this broad waiver language." (*East Richland Unit School District No. 1, Board of Education,* 3 Pub. Employee Rep. (Ill.) par 1055, at VII—155.)

Based on the inclusive nature of section 10.6, the Board found the Association had also waived any right to impact-bargaining on the revisions. The Board referred to other factors which supported the finding of waiver:

> "[1] [T]he record contains no evidence of conduct or statements which would lead to a mutual understanding that the contractual language does not mean what it appears to say.

> [2] The Association introduced no evidence of discussions during negotiations or otherwise to the effect that the parties did not waive their respective mid-term bargaining rights and obligations when they agreed to this clause.

> [3] Under ordinary circumstances, the understandings of the parties are identified on the basis of their objective manifestations; the Association's subjective belief alone that it did not waive anything by this clause is insufficient.

> Finally, we emphasize that our holding today does not permit a party to violate contractually protected terms and conditions of employment. We thus note that [4] the 1985-86 agreement contained no provision specifically addressing the issue of school calendar or revision thereto. *** [5] Nor did that agree-

ment contain any maintenance of standards clause." *East Richland Unit School District No. 1, Board of Education,* 3 Pub. Employee Rep. (Ill.) par. 1055, at VII—155.

## II

On appeal the Association does not contest the Board's March 1987 ruling, but argues the Board erred in formulating the legal standard for assessing a defense of waiver based on language in a collective-bargaining agreement. The Association maintains the standard stated by the Board is contrary to both the weight of authority developed under the Labor Management Relations Act, 1947 (LMRA) (29 U.S.C. §141 *et seq.* (1982)) and in sister States, and to public policy and the purposes of the Act.

## A

■ The standard of review applicable to the decisions of administrative agencies is as stated by the supreme court in *City of Decatur v. AFSCME, Local 268* (1988), 122 Ill. 2d 353, 361, 522 N.E.2d 1219, 1222:

"As a general rule, courts will accord deference to the interpretation placed on a statute by the agency charged with its administration. (*Blum v. Bacon* (1982), 457 U.S. 132, 141, 72 L. Ed. 2d 728, 736, 102 S. Ct. 2355, 2361; *Airey v. Department of Revenue* (1987), 116 Ill. 2d 528, 536[, 508 N.E.2d 1058, 1062]; *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 152[, 447 N.E.2d 295, 300]; 5 K. Davis, Administrative Law §29:16 (2d ed. 1984).) An administrative agency's interpretation is not binding, however, and it will be rejected when it is erroneous. *Securities Industry Association v. Board of Governors of the Federal Reserve System* (1984), 468 U.S. 137, 142-43, 82 L. Ed. 2d 107, 113, 104 S. Ct. 2979, 2982; *Northern Trust Co. v. Bernardi* (1987), 115 Ill. 2d 354, 365[, 504 N.E.2d 89, 93]."

We have looked to the decisions of the Federal courts reviewing cases arising under the LMRA involving a defense of contractual waiver and find the circuit courts are in disagreement as to the applicable standard of review. (Compare *Tocco Division of Park-Ohio Industries, Inc. v. NLRB* (6th Cir. 1983), 702 F.2d 624, 627, 112 L.R.R.M. 3089, 3091, citing *Beth Israel Hospital v. NLRB* (1978), 437 U.S. 483, 500-01, 57 L. Ed. 2d 370, 385-86, 98 S. Ct. 2463, 2473-74 (stating, in another context, the NLRB "necessarily must have authority to formulate rules to fill the interstices of the broad statutory provisions" it

administers, and the function of striking the balance between conflicting legitimate interests in order to effectuate national labor policy is a responsibility committed primarily to the NLRB, subject to limited judicial review), with *Local Union 1395, IBEW v. NLRB* (6th Cir. 1986), 797 F.2d 1027, 1031, 122 L.R.R.M. 3265, 3268 (and cases cited therein) (affording NLRB's interpretation of contractual provisions "no particular deference").) As we agree with the Board's determination here, we need not determine the degree of deference to be accorded in cases involving a contractual waiver defense.

██ █ We take note, however, of the following statement of general principles on evaluating a unilateral action as an unfair labor practice:

"[A] unilateral change is not *per se* an unfair labor practice. *** [S]ince only unilateral *changes* are prohibited, an unfair labor practice will not lie if the 'change' is consistent with the past practices of the parties. R. Gorman, *Basic Text on Labor Law*, 450-54 (1976). Finally, even if there has actually been a unilateral change in a term and condition of employment, the employer may successfully defend the action by demonstrating that there was not a bad faith refusal to bargain. The crucial inquiry in such event is whether the employer's unilateral action deprived the union of its right to negotiate a subject of mandatory bargaining. Hence, if the record demonstrates either that the union was in fact given an opportunity to bargain on the subject or that the collective bargaining agreement authorized the change or that the union waived its right to bargain, courts will not find bad faith. *N.L.R.B. v. Cone Mills, Corp.*, 373 F.2d 595, 64 LRRM 2536 (4th Cir. 1967); Gorman, supra, 400, 443-45." (*Foley Education Association v. Independent School District No. 51* (Minn. 1984), 353 N.W.2d 917, 921, 120 L.R.R.M. 2367, 2369-70.)

Here, according to the stipulated facts, the employer made revisions to the school calendar in a manner *consistent with its past practice, i.e.*, the conduct here is more accurately described as a "unilateral action" than as a "unilateral change."

## B

██ We have considered the parties' arguments on appeal, and find, first, the Board expressly declined to determine whether revisions to the school calendar are a mandatory subject of bargaining under the Act. *East Richland Unit School District No. 1, Board of Education*, 3 Pub. Employee Rep. (Ill.) par. 1055, at VII—155 n.6.

■ Second, the Board did not rely solely on the language of the zipper clause. Rather, the Board concluded the language of the zipper clause was conclusive of the issue when no evidence indicated the clause did not "mean what it appears to say." *East Richland Unit School District No. 1, Board of Education,* 3 Pub. Employee Rep. (Ill.) par. 1055, at VII—155.

### III

■ The Association contends that, in formulating its approach to the issue in this case, the Board disregarded the historical development and interpretation of zipper-clause language. The absence of such a discussion in the Board's decision cannot be equated to its disregard of precedent under other statutes. Examination of cases under the LMRA shows the National Labor Relations Board (NLRB) modified its approach to evaluating a contractual waiver defense in an unfair labor practice case in the period from about 1972 to 1974. Prior to this time, the NLRB gave only limited effect to the language of broad zipper clauses, requiring evidence that the parties had waived the midterm bargaining obligation as to the specific subject at issue in order to show a clear waiver of the employees' interest in that subject. As stated by a leading treatise:

> "Prior to 1974, the [NLRB] strictly applied the rule that only 'clear and unmistakable' language in the contract expressly waiving the right to negotiate over a particular subject would suffice to relieve a party of the duty to bargain. This was especially the case with broad 'zipper' clauses which stated that the contract was the complete agreement between the parties on all subjects. Such clauses, standing alone, did not constitute a sufficiently clear and unmistakable waiver as to a specific bargaining item." (1 C. Morris, The Developing Labor Law 642 (2d ed. 1983).)

This is basically the standard the Association argues the Illinois Educational Labor Relations Board should have applied here.

By 1974, the NLRB had modified its approach so that the language of broad zipper clauses might be given effect, supporting a contractual waiver defense, absent evidence of negotiating history and other surrounding circumstances which the NLRB found to require a contrary result. The application of this reformulated approach has been described as follows:

> "The [NLRB's] 1974 decision in *Radioear Corp.* [(1974), 214 N.L.R.B. 362, 87 L.R.R.M. 1330,] retreated from such a rigid interpretation. The contract in question contained a broad zip-

per clause. During the term of the agreement, the union sought to bargain with the employer over the employer's unilateral withdrawal of a 'turkey money' bonus, which was not mentioned in the contract. Two members of the [NLRB majority] found that the union had waived the right to bargain over the bonuses, in light of the 'negotiating history and other surrounding circumstances,' including the fact that the union unsuccessfully had sought a maintenance-of-benefits clause during the negotiations. Rather than the waiver being solely a matter of 'clear and unmistakable' language in the contract, the [NLRB] held that a contractual waiver may be apparent by 'contract interpretation' encompassing relevant provisions in the contract, the bargaining history, and past practice.

The [NLRB] has continued to adhere to this broader position taken in *Radioear Corp.* The circuit courts, however, are split on the issue, with some circuits following a more flexible approach, while others continue to apply other analyses." (1 C. Morris, The Developing Labor Law 642-43 (2d ed. 1983).)

With respect to the decisions of the Federal courts, compare, *e.g.*, *NLRB v. Southern Materials Co.* (4th Cir. 1971), 447 F.2d 15, 77 L.R.R.M. 2814 (declining enforcement of NLRB order finding employer violated sections 8(a)(5) and (a)(1) of the LMRA (29 U.S.C. §§158(a)(1), (a)(5) (1982)) by unilaterally discontinuing a practice of paying Christmas bonuses to employees, but remanding to NLRB for factual findings on whether maintenance of standards clause constituted "words of art" sufficiently broad to include the regularly, previously paid Christmas bonuses), and *NLRB v. Auto Crane Co.* (10th Cir. 1978), 536 F.2d 310, 92 L.R.R.M. 2363 (denying enforcement of NLRB order finding a section 8(a)(5) violation in the employer's unilateral imposition of a wage increase and thrift plan during the term of an agreement; holding the zipper clause of the labor contract—including the phrase referring to "any subject or matter not specifically referred to or covered in" the contract—constituted a clear waiver of the right to bargain), and *Aeronca, Inc. v. NLRB* (4th Cir. 1981), 650 F.2d 501, 107 L.R.R.M. 2687 (denying enforcement of NLRB order finding employer committed unfair labor practices by unilaterally discontinuing its practice of giving its employees Christmas turkey, holding the union waived the bargaining duty in that (1) the prior contract did not obligate employer to give turkeys and (2) negotiations leading to existing contract indicated union abandoned any attempt to make giving the turkeys obligatory), with *NLRB v. Challenge-Cook Brothers of Ohio, Inc.* (6th Cir. 1988), 843 F.2d 230, 127 L.R.R.M. 3181 (grant-

ing enforcement of NLRB order holding the employer violated sections 8(a)(1) and (a)(5) of the LMRA, finding zipper clause did not amount to a relinquishment of the right to bargain over effects of the employer's unilateral shift of production from one bargaining unit to another).

## IV

■ Counsel for the Association contends the legal standard stated by the Board is distinctly different from that which has evolved in decisions of the NLRB and Federal courts in interpreting the LMRA in cases such as this. While this position is premised on a misstatement of the legal standard enunciated by the Board's decision, and although the Board did not have the benefit of the briefs and extensive citations which have been presented on appeal, we have nevertheless undertaken a careful analysis of the cases in this area of law in order to determine whether the standard formulated by the Board is, as counsel for the Association maintains, an aberrant one. We conclude it is not.

## A

We begin with the case of *Radioear Corp.* (1972), 199 N.L.R.B. 1161, 81 L.R.R.M. 1402 (deferring its decision to parties' arbitration procedure), *dismissed* (1974), 214 N.L.R.B. 362, 87 L.R.R.M. 1330. There the "zipper" or "wrap up" clause provided:

> "It is acknowledged that during negotiations which resulted in this agreement, the Union had the unlimited right and opportunity to make demands and proposals with respect to all proper subjects of collective bargaining. Therefore, for the life of this agreement, the Union agrees that the Company shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this agreement." (*Radioear Corp.* (1972), 199 N.L.R.B. 1161, 1161, 81 L.R.R.M. 1402, 1403.)

In first considering the case in 1972, in a 3 to 2 decision the NLRB majority stated:

> "The Trial Examiner rejected Respondent's contentions and found the violation as alleged, relying, as do our colleagues, on the principle that there must be a 'clear and unequivocal' waiver of the right involved. We do not agree. Where the parties, as here, have engaged in the collective-bargaining process, as contemplated by the statute, and have executed a collective-bargaining agreement, setting forth the terms of their bargain,

we are unwilling to ignore what has taken place at the bargaining table and decide the parties' dispute on the basis of a simplistic formula arrived at by this Board.

While in some situations the rule of 'clear and unequivocal' waiver may be a realistic appraisal of the bargain reached, in other situations it may not be. *The answer does not, in our view, call for a rigid rule, formulated without regard for the bargaining postures, proposals, and agreements of the parties, but rather, more appropriately, should take into consideration* such *varied factors* as (a) the precise wording of, and emphasis placed upon, any zipper clause agreed upon; (b) other proposals advanced and accepted or rejected during bargaining; (c) the completeness of the bargaining agreement as an 'integration'—hence the applicability or inapplicability of the parol evidence rule; and (d) practices by the same parties, or other parties, under other collective-bargaining agreements. These are but a few of the many factors that could and would be considered by an arbitrator." (Emphasis added.) (*Radioear Corp.* (1972), 199 N.L.R.B. 1161, 1161, 81 L.R.R.M. 1402, 1403.)

Concluding that the bargaining agreement and its execution were at the heart of the disagreement, the *Radioear Corp.* majority deferred its decision to the parties' contractual settlement procedures (see *Collyer Insulated Wire* (1971), 192 N.L.R.B. 837, 77 L.R.R.M. 1931), while retaining jurisdiction to review the arbitration award (see *Spielberg Manufacturing Co.* (1955), 112 N.L.R.B. 1080, 36 L.R.R.M. 1152).

The arbitrator, however, disclaimed authority to pass on the issue before the NLRB, *i.e.*, the employer's bargaining obligation, and the case was again before the NLRB in 1974, when the NLRB majority dismissed the complaint in a 2-1-2 decision (one member concurring in the result reached by two members), reiterating the factors stated in the 1972 decision, and holding the union had waived any obligation the employer might have had to bargain over elimination of the bonus:

"We note, first, that during the course of negotiations for this first contract, the Union sought a maintenance of standards provision, whereby 'all benefits and privileges in effect prior to this agreement will continue in effect unless amended or changed herein.' As the Administrative Law Judge found, the Company refused to incorporate this language into the contract and the matter was abandoned. Rather, the parties agreed to the zipper clause ***. The zipper clause specifically

stated that the Union had had an opportunity to bargain over all proper subjects of collective bargaining. By its terms, it contained an agreement by the Union that the Company was relieved of any obligation to bargain 'with respect to any subject or matter not specifically referred [to] or covered in this agreement.' " (*Radioear Corp.* (1974), 214 N.L.R.B. 362, 363, 87 L.R.R.M. 1330, 1332.)

The two members joining as the NLRB majority opinion in the case considered the facts before them, including the bargaining history of the parties, and found that the waiver clause—specifically waiving the obligation of the employer to bargain over any subject or matter not specifically referred to or covered in the agreement—had been agreed to by the union. In light of these circumstances, the majority opinion found there was a conscious, knowing waiver of any bargaining obligation as to unspecified benefits and further found there was no repugnancy to the LMRA's principles in giving effect to such a waiver under these circumstances and concluded that the waiver in the collective-bargaining agreement should be given meaning and effect. *Radioear Corp.*, 214 N.L.R.B. at 364 & n.4, 87 L.R.R.M. at 1332 & n.4.

## B

In March 1982, an NLRB panel decided *Rockwell International Corp.* (1982), 260 N.L.R.B. 1346, 109 L.R.R.M. 1366, and found the employer violated sections 8(a)(5) and (a)(1) of the LMRA (29 U.S.C. §§158(a)(1), (a)(5) (1982)) by refusing to bargain about unilateral increases of in-plant food prices during the term of a bargaining agreement. There, the closure clause itself incorporated a "maintenance of standards" provision, stating:

"The Company and the Union acknowledge that during negotiations which resulted in this Labor Agreement, each party had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understandings and arrangements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Union agrees that the Company may take the appropriate action concerning any matters not covered by this Agreement which involve the expeditious management of the Plant. *If such actions effect a significant change in well-defined or long-established working conditions and are legally required subjects of collective bargaining, the Union may request negotiations on them.*

> With respect to any subject or matter not specifically referred to or covered in this Agreement which was within the knowledge of both parties at the time they negotiated or signed this Agreement, the parties agree that such subject or matter will not be the subject of negotiations during the term of this Agreement unless mutually agreed to by the parties or unless there is a change in working conditions as discussed above." (Emphasis added.) (260 N.L.R.B. at 1349-50, 109 L.R.R.M. at 1366.)

The NLRB found this "reopener language" on its face applied to the prices of in-plant food services which had been provided for at least four years and were mandatory subjects of bargaining (see *Ford Motor Co. v. NLRB* (1979), 441 U.S. 488, 60 L. Ed. 2d 420, 99 S. Ct. 1842). The NLRB concluded that even if this language did not operate as an *express reservation* by the union of its right to demand bargaining on this subject, it did not amount to an *express waiver* of the statutory right. The NLRB panel, including the two members who dissented in both decisions in *Radioear Corp.*, stated:

> "It is well established that such a waiver will not lightly be inferred *in the absence of clear and unequivocal language.* Such language is not present in this case. Thus, where, as here, an employer relies on a purported waiver to establish its freedom unilaterally to change terms and conditions of employment not contained in the contract, the matter at issue must have been fully discussed and consciously explored during negotiations and the union must have consciously yielded or clearly and unmistakably waived its interest in the matter. *** [T]he subject of cafeteria and vending food prices was never discussed during the 1978 contract negotiations. We therefore find that the Union did not consciously yield its statutory right and that the language in article XVII [the closure language] does not amount to an effective waiver of the Union's right to request bargaining on changes in the in-plant food prices." (Emphasis added.) *Rockwell International Corp.*, 260 N.L.R.B. at 1347, 109 L.R.R.M. at 1367.

### C

Thereafter, in May 1982, the NLRB issued a 4 to 1 supplemental decision in *GTE Automatic Electric, Inc.* (1982), 261 N.L.R.B. 1491, 110 L.R.R.M. 1193, on reconsidering the earlier decision in the case (*GTE Automatic Electric, Inc.* (1979), 240 N.L.R.B. 297, 100 L.R.R.M. 1204). Again, two of the three NLRB panel members in the

earlier decision had been the dissenters in *Radioear Corp.* The 1979 decision found the employer had engaged in unfair labor practices in violation of sections 8(a)(1) and (a)(5) of the LMRA and ordered the employer to cease announcing and misrepresenting to employees that a savings and investment plan it had initiated was available only to salaried nonunion employees, and refusing to bargain collectively concerning the plan with the union as the exclusive bargaining representative of employees in the appropriate unit.

The zipper clause in the agreement considered in *GTE Automatic* provided:

> "The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understanding and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this agreement. Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered by this Agreement even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement." (*GTE Automatic Electric, Inc.* (1979), 240 N.L.R.B. 297, 298 n.4, 100 L.R.R.M. 1204, 1205 n.4.)

In the 1979 decision, the NLRB panel found that (1) during the term of the contract, the employer was obligated to bargain about matters not specifically covered in the contract or unequivocally waived by the union; and (2) the contractual zipper clause in issue did not constitute a waiver, because the benefit involved was neither in existence nor proposed when the clause was agreed upon and, therefore, it could not have been waived.

Upon reconsideration in 1982, the NLRB majority found (1) the employer could rely on the waiver contained in its contractual zipper clause, and (2) that clause clearly and unequivocally covered the union's request to bargain concerning the implementation of a *new benefit*. Therefore, because the implementation of the plan benefitting the nonunion employees did not constitute a unilateral change of *existing* working conditions and because the bargaining history was completely

silent on the matter, the employer could lawfully refuse to enter into midterm negotiations on the subject. The NLRB majority opined that, by permitting the employer to invoke the zipper clause "as a shield against the Union's midterm demand for bargaining over a new benefit, and by giving literal effect to the parties' waiver of their bargaining rights, industrial peace and collective-bargaining stability will be promoted." (*GTE Automatic Electric, Inc.*, 261 N.L.R.B. at 1491-92, 110 L.R.R.M. at 1193-94.) The NLRB majority emphasized that the employer sought only to maintain the status quo regarding the terms and conditions of employment of unit employees and had not made unilateral changes that directly and adversely affected unit employees, with an accompanying effect of undermining and derogating the union. Rather, by relying on the zipper clause for its refusal to discuss *new subjects* during the contract term, the employer attempted nothing more than to have the parties adhere to, and not alter, their contractual commitments and the existing employment conditions.

By construing the contractual zipper clause to permit the employer's actions, the NLRB majority held only that the union had waived its right to require the employer to bargain midterm about a new subject matter not specifically covered by the terms of the existing contract and, in conclusion, emphasized this decision "properly adds and accords stability and dignity to the parties' collective-bargaining relationship and the contract negotiated therefrom." (*GTE Automatic Electric, Inc.*, 261 N.L.R.B. at 1492, 110 L.R.R.M. at 1194.) The majority specifically distinguished several categories of cases, noting its holding:

> "[Did] not disturb cases involving (1) a party's waiver or lack of waiver of its right to bargain over specific matters during a contract term because of the negotiating history and surrounding circumstances (see, *e.g.*, *Proctor Manufacturing Corporation*, 131 NLRB 1166, 48 LRRM 1222 (1961); *Unit Drop Forge Division Eaton Yale & Towne, Inc.*, 171 NLRB 600, 68 LRRM 1129 (1968), *enfd. in relevant part* 412 F.2d 108, 71 LRRM 2519 (7th Cir. 1969)); (2) a party engaging in deceptive conduct during negotiations, so that there is no conscious or knowing waiver of rights (see, *e.g.*, *Conval-Ohio, Inc.*, 202 NLRB 85, 82 LRRM 1701 (1973)); or (3) an employer unilaterally changing the employees' existing working conditions, then using the zipper clause as a 'sword' to justify its refusal to discuss the unilateral changes made to the status quo (see, *e.g.*, *Pepsi-Cola Distributing Company of Knoxville, Tennessee, Inc.*, 241 NLRB 869, 100 LRRM 1626 (1979))." (*GTE Automatic Electric, Inc.*,

261 N.L.R.B at 1492 n.3, 110 L.R.R.M. at 1194 n.3.)
Thus, in the majority's 1982 decision in *GTE Automatic*, the NLRB distinguished several cases cited by the Association, including *Unit Drop Forge Division, Eaton Yale & Towne, Inc.* (1968), 171 N.L.R.B. 600, 68 L.R.R.M. 1129, *enforced as modified* (7th Cir. 1969), 412 F.2d 108, 71 L.R.R.M. 2519 (employer action virtually discontinued incentive plan for the operation it affected, although parties' supplementary labor agreement specifically provided "before any changes in these incentive plans are made or new plans established, they will be agreed upon by the parties"; held, general wording of closure or zipper clause in master agreement did not constitute waiver of duty to bargain on this subject), and *Pepsi-Cola Distributing Co. of Knoxville, Tennessee, Inc.* (1979), 241 N.L.R.B. 869, 100 L.R.R.M. 1626, *enforced* (6th Cir. 1981), 646 F.2d 1173, 107 L.R.R.M. 2252, *cert. denied* (1982), 456 U.S. 936, 72 L. Ed. 2d 456, 102 S. Ct. 1993.

## D

Subsequent to the 1982 *GTE Automatic* decision, the NLRB applied a similar analysis in *Columbus & Southern Ohio Electric Co.* (1984), 270 N.L.R.B. 686, 116 L.R.R.M. 1148, *aff'd sub nom. IBEW Local 1466 v. NLRB* (D.C. Cir. 1986), 795 F.2d 150, 122 L.R.R.M. 2948. There, the NLRB panel concluded, contrary to the administrative law judge, the zipper clause agreed to by the parties constituted a clear and unmistakable waiver of the union's right to bargain over the elimination of a Christmas bonus and dismissed the complaint alleging the employer's unilateral cessation of a Christmas bonus without bargaining violated sections 8(a)(5) and (a)(1) of the LMRA.

In *Columbus & Southern*, the parties' zipper clause provided:

"It is the intent of the parties that the provision of this Agreement will supersede all prior agreements and understandings, oral or written, expressed or implied, between such parties and shall govern their entire relationship and shall be the sole source of any and all rights or claims which may be asserted in arbitration hereunder or otherwise.

The Union for the life of this Agreement hereby waives any rights to request to negotiate or to bargain with respect to any matters contained in this Agreement." (270 N.L.R.B. at 686, 116 L.R.R.M. at 1148.)

In negotiating this zipper clause, the employer made it plain the clause was to be all-inclusive and cover past practices and other matters so the resultant labor agreement would govern the parties' entire relationship. At no time during bargaining did either side broach the

subject of the Christmas bonus. In dismissing the complaint, the NLRB reasoned:

> "An examination of the contract language reveals that the parties clearly agreed that the provisions of the collective-bargaining agreement will 'supersede all prior agreements and understandings' and that the collective-bargaining agreement would govern the parties' 'entire relationship' and be the 'sole source of any and all rights or claims which may be asserted in arbitration hereunder *or otherwise*.' (Emphasis added.)
>
> A review of the complete contract indicates that the parties entered into an agreement addressing an entire spectrum of issues. These issues include many types of compensation for such occasions as funeral leave, personal use of an automobile, and jury duty. The collective-bargaining agreement also contains detailed provisions concerning wage rates." (270 N.L.R.B. at 687, 116 L.R.R.M. at 1149.)

The reviewing court distinguished prior cases where employers unilaterally changed terms and conditions of employment existing under past practice. The court, Judges Bork, Scalia and MacKinnon sitting, held both the breadth of the first part of the zipper clause, the "integration sentence," and its bargaining history supported the NLRB's finding that the zipper clause extinguished the Christmas bonus practice by limiting the rights to compensation to those found in the agreement and otherwise "wiping the slate clean." *IBEW Local 1466 v. NLRB,* 795 F.2d at 153, 122 L.R.R.M. at 2950-51.

### E

We comment on only two other NLRB and Federal court cases cited by the parties; the others either predated the above decisions or are otherwise distinguishable.

In *Indianapolis Power & Light Co.* (1985), 273 N.L.R.B. 1715, 118 L.R.R.M. 1201, *rev'd and remanded sub nom. Local Union 1395, IBEW v. NLRB* (D.C. Cir. 1986), 797 F.2d 1027, 122 L.R.R.M. 3265, the NLRB concluded the "no-strike clause" in the parties' collective-bargaining agreement "clearly and unmistakably" waived the employees' right to engage in sympathy strikes. On waiver of the right to engage in strike activity (conceptually distinct from the general waiver which may adhere as a result of contractual zipper-clause language), the reviewing court stated:

> "To be sure, the clear and unmistakable test dictates that the waiver of statutory rights may not be inferred casually. But that test also cannot be applied woodenly; whether rights have

been waived with the requisite clarity depends crucially upon context and 'the specific circumstances of each case.' " (*Local Union 1395, IBEW*, 797 F.2d at 1033, 122 L.R.R.M. at 3269, quoting *Metropolitan Edison Co. v. NLRB* (1983), 460 U.S. 693, 709, 75 L. Ed. 2d 387, 401, 103 S. Ct. 1467, 1478.)

The court reversed the Board's order dismissing the complaint and remanded the cause to the NLRB for further proceedings, reasoning:

"Were we faced only with the language of the agreement itself, we would have little trouble upholding the Board's order. But the words parties use in drafting contracts are only evidence of their intent; the words are not themselves the parties' intent. The Board may not, in the guise of enforcing the 'plain meaning' of contractual language, erect an inflexible presumption on an issue turning on the parties' *actual* intent. *** The intent of the parties to collective bargaining agreements is not to be discerned by reference to 'abstract definitions unrelated to the context in which the parties bargained,' *** especially where bargaining history is crucial to an understanding of that intent. In the proceeding below, Local 1395 introduced evidence that when the contract was negotiated the parties had asserted different interpretations of the no-strike clause and that neither party had acquiesced in the other's view. The ALJ concluded that the parties had agreed to disagree over whether sympathy strikes were covered by the clause. If accepted, this factual finding would be controlling: absent mutual consent on the issue, there could be no binding contractual commitment, see Restatement (Second) of Contracts §20, 201 (1979), and, *a fortiori*, no clear and unmistakable waiver of the right to honor picket lines. [Citations.]

"While stating generally that it agreed with the ALJ's conclusions respecting the extrinsic evidence of the parties' intent, the Board did not address this specific finding. *** The Board appears to have failed to do what its opinion acknowledges it must do in interpreting a no-strike clause: 'give the parties' intent controlling weight,' *id.*, whether that intent is established by the language of the clause itself, by inferences drawn from the contract as a whole, or by extrinsic evidence." (*Local Union 1395, IBEW*, 797 F.2d at 1036, 122 L.R.R.M. at 3272.)

In the case before us the Board did not fail to discuss relevant evidence, and the record evidence is not inconsistent with the Board's finding of waiver.

In *Americana Healthcare Center* (1985), 273 N.L.R.B. 1728, 118

L.R.R.M. 1288, *enforced as modified* (11th Cir. 1986), 782 F.2d 941, 121 L.R.R.M. 2768, the NLRB adopted the administrative law judge's recommended order and agreed that the parties, *by mutual mistake*, had omitted an agreed-upon sick-leave provision from the collective-bargaining agreement they negotiated and, therefore, the respondent employer violated the LMRA by unilaterally terminating the agreed-upon sick-leave program. The NLRB panel found it unnecessary to pass on the administrative law judge's discussion of the zipper clause. (*Americana*, 273 N.L.R.B. at 1728 n.1, 118 L.R.R.M. at 1288 n.1.) While the Eleventh Circuit Court of Appeals on review did discuss the "zipper clause," it did so in the context of the arguments raised on appeal. The court concluded, under the circumstances, the "zipper clause" had to be read with an implied exception and had no application to the actual agreement negotiated, but omitted from the written contract by inadvertence and mistake. Here, there was no omission by inadvertence or mistake.

### F

The decisions of the NLRB and the Federal courts interpreting similar provisions under the LMRA are persuasive authority. The Board is not, however, bound to interpret the Act as the NLRB or the Federal courts have interpreted the LMRA. Nevertheless, we find the interpretation and approach stated by the Board in its decision here is essentially in consonance with such NLRB decisions as that in *Radioear Corp.* in 1974, *GTE Automatic* in 1982, and *Columbus & Southern* in 1984. Certainly it cannot be said that the Board's approach herein is an aberrant one. The 1982 *GTE Automatic* decision noted several categories of cases the NLRB considered distinguishable from the circumstances in that case, and we find the cases in those categories are also inapposite to this case. (*GTE Automatic Electric, Inc.*, 261 N.L.R.B. at 1492 n.3, 110 L.R.R.M. at 1194 n.3.) By this holding, we do not foreclose the possibility that in a proper case the provisions of the collective-bargaining agreement may be found sufficiently different as to support a different conclusion from that here (*i.e.*, as in *Rockwell International Corp.*, where a maintenance of standards and reopener clause was included in the zipper provision), or the nature of the subject matter on which midterm bargaining is sought may lead the Board to a different result.

### V

Public-sector cases from other States may also be of persuasive value. Although all of these cases cited by counsel for the Associ-

ation contain language referring to the general principle that waiver must be established by clear and unmistakable language, none of the cases persuade us that the Board stated an erroneous standard, or an aberrant one.

*City of Rochester*, 1982 MERC Labor Opinions 324, 332, case No. 780–K–370 (Michigan Employment Relations Commission, Mar. 17, 1982), involved whether the employer could lawfully issue new or revised rules and regulations for its police department employees, during the term of a bargaining agreement, without bargaining with the employees' exclusive bargaining representative. (See Mich. Comp. Laws Ann. §§423.210, 423.216 (West 1978 & Supp. 1988).) The Michigan Commission had previously held the existence of a zipper clause was not sufficient evidence, by itself, of a clear and unmistakable waiver of the right to bargain over changes in mandatory terms and conditions of employment. The issue was not reached in *City of Rochester*, however, as the parties had not included consideration of their bargaining history in their threshold question. Accordingly, the Commission expressed no opinion on whether the zipper clause, taken in the context of the bargaining relationship, was intended as a complete waiver of the right to bargain over "rules." (See also 1982 MERC Labor Opinions, at 340 (administrative law judge's decision, June 19, 1981 ("whether the negotiations leading to this contract permit the inference of waiver cannot be determined since the parties declined to make a record on [the bargaining history]").) The case was remanded to the administrative law judge for further hearing.

In *Deptford Board of Education*, 7 Pub. Employee Rep. (N.J.) par. 12015 (New Jersey Public Employment Relations Commission, Dec. 11, 1980), the Commission found the employer committed unfair labor practices (see N.J. Stat. Ann. §§34:13A–5.4(a)(1), (a)(5) (West 1988)) by conduct which constituted a unilateral reduction in the salary and benefits of a position within the bargaining unit. The Commission rejected the employer's argument on the effect of the zipper clause as without merit, even if it applied to the facts, based on *In re State of New Jersey*, 3 Pub. Employee Rep. (N.J.) par. 78 (Public Employment Relations Commission, 1977), wherein the Commission had modified the "clear and unequivocal waiver test" to allow the trier of fact "to look at a variety of factors, such as the history of negotiations over the disputed contract provision, to determine if, in fact, there was a waiver of the right to negotiate." (7 Pub. Employee Rep. (N.J.) par. 12015, at 36.) The Commission found there was no evidence offered by the Board of Education to support its position that the clause was a "clear and unequivocal waiver" which should be

"mechanically applied" to the dispute. In the case before us, the waiver clause was not "mechanically applied" and the factors referred to by the New Jersey Commission are similar to those stated by the Board.

In *In re County of Nassau*, 13 Board Decisions par. 3095, case No. U—3933 (New York Public Employment Relations Board, Dec. 2, 1980), the Board found the employer violated the New York Taylor Law (see N.Y. Civil Service Law §209—a(1)(d) (McKinney 1983)) when it unilaterally discontinued a past practice of assigning county-owned vehicles to employees of its department of public works on a 24-hour basis. The Board rejected the county's arguments that (1) the labor agreement contained a zipper clause which permitted it to eliminate the use of county-owned vehicles, and (2) an employer may change a past practice as to working conditions unless there is a contractual provision requiring maintenance of past practices. The New York Board stated the duty to negotiate in good faith includes an obligation to continue past practices that involve mandatory subjects of negotiation, even in the absence of a provision to that effect in the contract. (Accord *In re Board of Cooperative Educational Services v. New York State Public Employment Relations Board* (1981), 82 A.D.2d 691, 444 N.Y.S.2d 226.) In the case before us, the employer did not discontinue a past practice, but acted consistent with it.

In *Newark Unified School District*, 4 Pub. Employee Rep. (Cal.) par. 11012, case No. SF—CE—367 (hearing officer's decision, Jan. 18, 1980), the hearing officer found the school district violated the Educational Employment Relations Act (see Cal. Government Code §§3543.5(a), (b), (c) (Deering 1982 & Supp. 1988)) by adopting a resolution unilaterally to make certain changes and authorize lay-off proceedings under the education code without negotiating with the union. The hearing officer rejected the employer's argument that negotiations over these subjects had been waived as a result of contract language agreed to by the association, *i.e.*, the zipper clause. The hearing officer found the parties' negotiating history showed both the union's objections to the initial contract language proposed by the employer and its understanding that the final text additions precluded unilateral actions:

> "The [1] consistent Association rationale in opposition' to the District's earlier proposals [in negotiations], [2] the failure of the District to argue to the contrary at that time, [3] the subsequent modification of the initial proposals, and [4] the *Association's understanding (unrebutted) that the changes served to limit unilateral District authority*, overcome any claim by the

District at this date that the contractual district rights and zipper clauses constituted a waiver by the Association of any right to negotiate." (Emphasis added.) (*Newark Unified School District*, 4 Pub. Employee Rep. (Cal.) par. 11012, at 40 (hearing officer).)

Here, there was no such bargaining history. This analysis is consistent with, rather than contrary to, the position taken by the Board in the instant case: it states factors deemed to "overcome" the employer's contractual waiver defense.

*In re Petition of Deerfield Education Association*, case VI, No. 23671 DR(M)—103, Decision No. 17503 (Wisconsin Employment Relations Commission, Dec. 19, 1979), was a declaratory ruling holding a blanket waiver clause was a permissive, rather than mandatory, subject of bargaining on which the employer could not insist to impasse during negotiations. In the ruling the Commission discussed the third clause of the proposed zipper language, purporting to waive the right to demand midterm bargaining on "other subjects or matters relating to wages, hours or conditions of employment even though such subject or matter may not have been within the knowledge and contemplation of either or both of the parties at the time that they negotiated or signed this Agreement." The Commission cited its earlier decision in *Wisconsin Federation of Teachers v. State of Wisconsin*, Case L, No. 18305 PP(S)—23, Decision No. 13017—D (Wisconsin Employment Relations Commission, May 17, 1977), as stating such blanket waivers *may only be given such effect as the negotiating history and other surrounding circumstances seem to make appropriate in a given case*—and then only when its application is not repugnant to the basic policies of the law. (See, *e.g.*, *Timken Roller Bearing Co. v. NLRB* (6th Cir. 1963), 325 F.2d 746, 750-51, 54 L.R.R.M. 2785, 2788 (failure to have right stated in labor contract does not mean it does not exist by virtue of statute).) This standard is not contrary to that stated by the Board here.

In *Harrisburg School District*, 13 Pub. Employee Rep. (Pa) par. 13077, case No. PERA—C—11, 603—C (Pennsylvania Labor Relations Board, Mar. 5, 1982), the Board found the school district violated the statutory duty to bargain (see Pa. Stat. Ann. tit. 43, §1201(a)(5) (Purdon Supp. 1987)) by subcontracting its bus transportation services without prior discussion with the union and by refusing to bargain over the impact of its decision to eliminate teacher aide positions. The Pennsylvania Board had consistently held that the existence of a broadly worded zipper clause in a contract demonstrated *per se* that the parties had indirectly bargained, and consequently waived the

right to bargain, over all the subjects of collective bargaining, whether or not they were specifically referred to in the contract or whether or not they were within the contemplation of the parties. The Pennsylvania Board reformulated its policy on interpretation of broadly worded zipper clauses:

"After a careful review of case law in other jurisdictions, the Board determined that while a zipper clause is useful 'as a shield protecting a party from incessant demands to negotiate,' it should not be viewed 'as a sword empowering a party to disturb the equilibrium of a relationship by making unilateral changes in negotiable subjects' during the life of a contract. 11 PPER at 389. Therefore, consistent with the more widely held federal and state precedent, the Board modified its prior broad reading of waiver clauses so that *in order to justify a unilateral change in terms and conditions of employment a party must demonstrate that the other party 'consciously yielded or clearly and unmistakably waived its interest' in bargaining over the specific area in which change is sought.* 10 PPER at 390. This Board will no longer infer a waiver with respect to the statutory right to bargain over a mandatory subject. The relinquishment of the right to bargain, to be effective, must be clear and unmistakable." (Emphasis added.) (*Harrisburg School District*, 13 Pub. Employee Rep. (Pa.) par. 13077, at 132, referring to its decision in *Venango County Board of Assistance*, 11 Pub. Employee Rep. (Pa.) par. 11223 (1980).)

This approach was affirmed as reasonable on review in a 4 to 3 decision in *Commonwealth v. Pennsylvania Labor Relations Board* (1983), 74 Pa. Commw. 1, 10-12 & n.3, 459 A.2d 452, 456-57 & n.3 (Venango County Board of Assistance) (employer unilaterally imposed smoking regulation), with the court noting out-of-State decisions relied on by the Pennsylvania Board, stating: "By these authorities, a union waiver of the right to bargain on mandatory subjects during the term of an agreement will not be found in a boiler plate waiver clause." (74 Pa. Commw. at 11, 459 A.2d at 457.) This approach was followed in *Commonwealth v. Pennsylvania Labor Relations Board* (1983), 78 Pa. Commw. 419, 467 A.2d 1187 (West Chester State College) (unilateral change in parking fee), and *Commonwealth v. Pennsylvania Labor Relations Board* (1984), 82 Pa. Commw. 330, 474 A.2d 1213 (Edinboro State College) (unilateral change in manner of assignment of summer employment for faculty members). However, we note first that each of these cases involved a bargaining agreement which included a "maintenance of past practices" clause as well as a zipper

clause, whereas the labor contract in the instant case did not. Second, it cannot be concluded from *Harrisburg School District* that the employer cannot meet its burden of production on the defense of waiver by reference to the express language of the contract. Moreover, even if the Pennsylvania Board chose to set such a standard for the burden of production, the Illinois Educational Labor Relations Board need not follow.

Neither do the cited court decisions of sister States persuade us that the Board erred on the issue here. In *National Education Association-Wichita v. Unified School District No. 259* (1983), 234 Kan. 512, 674 P.2d 478, 117 L.R.R.M. 3137, the Supreme Court of Kansas upheld a district court decision enjoining the school district's unilateral implementation of a schedule change by eliminating a "coordination" work period and replacing it with an additional period of classroom instruction as, by statute, made mandatorily negotiable. (See Kan. Stat. Ann. §72—5413(*1*) (1985).) In light of this statutory limitation on the employer's general authority and the trial court's finding of nonwaiver, the court rejected the argument that the management rights and zipper clauses in the parties' bargaining agreement created a contractual distinction from prior Kansas decisions.

*Palm Beach Junior College Board of Trustees v. United Faculty of Palm Beach Junior College* (Fla. 1985), 475 So. 2d 1221, 120 L.R.R.M. 3223, approved in part a decision of the District Court of Appeals affirming an order of the Public Employee Relations Commission holding the college had committed an unfair labor practice in negotiating with faculty members to impasse for a waiver clause. (See Fla. Stat. Ann. §447.403 (West 1981 & Supp. 1988).) It was in this context that the court discussed contractual waiver of the right to midterm bargaining.

The Supreme Judicial Court of Maine has recognized that contractual waiver may be given effect. See *State v. Maine State Employees Association* (Me. 1985), 499 A.2d 1228, 121 L.R.R.M. 2286.

VI

■■ As to the "sword" and "shield" analysis referred to in *GTE Automatic Electric, Inc.* (1982), 261 N.L.R.B. at 1491-92 & n.3, 110 L.R.R.M. at 1193-94 & n.3, and other cases, we note the court in *State v. Maine State Employees Association* (Me. 1985), 499 A.2d 1228, 121 L.R.R.M. 2286, found there was no need for such a balancing test where a contractual analysis leads unequivocally to a finding of waiver. Moreover, application of the analogy in this case would not require a different result from that reached by the Board—the em-

ployer here must be deemed to rely on waiver as a "shield" against the union's demand for bargaining, as the employer proceeded *consistent with past practice.*

## VII

■■ The Association's position is, essentially, that the charged party should be required to prove not only the parties' agreement to the inclusion of the zipper clause in the bargaining agreement, but also the charging party's *actual intent* to waive midterm bargaining over the specific matter which is the subject of the charge, *e.g.*, revisions to the school calendar. Such an interpretation would render zipper or closure clauses largely ineffective to their purpose, according one of the parties more than it was able to achieve at the bargaining table. This we decline to do on the facts of this case.

The "actual intent" approach advocated by the Association has been rejected in another context in *Local Union 1395, IBEW v. NLRB* (D.C. Cir. 1986), 797 F.2d 1027, 122 L.R.R.M. 3265. There, the union advanced a somewhat similar argument, maintaining that while a court or arbitrator would not be precluded under accepted principles of traditional contract law from reading a general no-strike clause to cover sympathy strikes, the NLRB could not find a waiver of the right to honor picket lines without more specific contractual language or compelling extrinsic evidence. The D.C. Circuit rejected this argument, reasoning:

"[O]ne might well think that finding a 'clear and unmistakable waiver' of a statutory right requires more elaborate evidentiary support than simply placing an objective construction on a contract. But that is not in fact the approach adopted by the Supreme Court. *** The relevant cases simply do not support the proposition that waiver hinges upon employees' subjective intent rather than the mutual consent reflected in a contractual commitment.

*** In our view, federal labor policy is more threatened by the interposition of artificial rules of construction upon the parties' mutual intent when 'waiver' of sympathy strikes is at stake than by the Board's practice of giving effect to the clear import of contractual language. *** A grudging or stilted interpretation of collective bargaining agreements tends to encroach upon the fundamental national policy favoring the ordering of the employer-employee relationship by voluntary bargaining rather than governmental fiat, *cf. H. K. Porter Co. v. NLRB*, 397 U.S. 99, 73 LRRM 2561 (1970); it injects into the collective

bargaining process an uncertainty that diminishes the prospects for successful bargaining. See *United States Steel Co. v. NLRB,* 711 F.2d 772, 780, 113 LRRM 3227 (7th Cir. 1983); *Pacemaker Yacht Co. v. NLRB,* 663 F.2d 455, 460, 108 LRRM 2817 (3d Cir. 1981)." *(Local Union 1395, IBEW v. NLRB* (D.C. Cir. 1986), 797 F.2d 1027, 1031-32, 122 L.R.R.M. 3265, 3268-69.)

The same rationale supports the Board's decision here.

For the reasons herein stated, the Board's decision is affirmed.

Affirmed.

GREEN, P.J., and KNECHT, J., concur.